Council. Thank you, Your Honors. For the record, my name is Tom Woodbury, and I'm here to argue the merits of the preliminary injunction appeal for the appellants Wildwest and Friends of the Bitterroot. The lower court in this case denied a preliminary injunctive relief on the grounds that we had not shown a likelihood of prevailing on the merits. Accordingly, I will address the merits today, first of our substantive claims and, time permitting, our procedural claims. Counsel, the standard of review that we apply in this situation is use of discretion. True? Clear error on the facts or a misapplication or misunderstanding of the law, the legal standards. In this case, we argue on both, and I'll try to... All right. To quickly update the court on the proceedings in this case, under the HFRA, this case is scheduled for final in the court below, and final arguments are scheduled for December 8th, and logging is either underway or about to commence. Thus, should the court agree with our arguments on the merits today, we would respectfully request injunctive relief, sui sponte. Your Honors, beginning with the substantive violations in this case, the National Forest Management Act prohibits logging that would significantly impair the land or, more specifically, result in irreversible damage to soil productivity. In essence, what Congress recognized was that while trees can be replanted and replaced, soil is an irreplaceable resource, and once the soil resource has been irreversibly damaged, then the forest loses its ability to regenerate. In order to insure against this irreversible damage to soil resources, forests in the northern Rockies have come to rely on the regional soil quality standards, because most of the forest plans themselves don't have adequate standards for protecting the soil resources. The core assumption of these regional standards is that in any cutting unit, any proposed cutting unit, as long as the soil damage does not exceed 15% threshold, then it is not considered to be irreversible damage, and it is assumed that the forest will be able to regenerate. This preventative approach in the regional standards makes perfect sense in an undisturbed landscape. Basically, as long as you go in and everywhere you log, you don't exceed that threshold, then it is assumed that the soils are not irreversibly damaged and the forest will be able to continue to grow naturally. But in an area like the Middle East Fork, which where a third of the project area has been previously logged, most of that logging took place before any threshold was established or before any standards were in place. And as a result, we have entire sub-drainages that by themselves are over 15% disturbed soils. The regional approach by itself does not address all of the issues. Specifically, it doesn't, as the soil scientists in the Bitterroots themselves recognize, the regional standard doesn't address the effect of soils damage on a cumulative area-wide or landscape basis. Well now, with respect to this particular issue, isn't it correct that we apply an arbitrary and capricious standard? In other words, did the Forest Service simply wing it and made no significant effort whatsoever to pay attention to the soil impact? That is correct, Your Honor, and our argument is that in this case, the Forest Service basically limited its analysis to application, strict application of the regional standard, which is on a cutting unit by cutting unit basis, and it dropped any analysis that the soil scientists said was important for actually accurately describing the soil conditions in the project area. It dropped the analysis of cumulative effects from past timber harvests. Well, didn't they drop some of the units from cutting because of McBride's soil recommendation? So they didn't ignore McBride's recommendation? No, Your Honor, the units they dropped were the units that the soil scientists said would exceed or already was exceeding or would exceed the 15% threshold if logging was to afford. That's the site-specific application or cutting unit application of the regional standard, and we're not... ...within the Forest Service about the winter logging and the summer logging soil damage. Now, how did the district judge go wrong in choosing to believe that they had adequately considered McBride's? Well, simply because there were not two schools of thought concerning the cumulative effects of past logging on the soil resource in the project area or in the sub-watersheds. The two schools of thought were in how to apply the regional standard to the proposed cutting units, and we're not saying that the lower court erred in that regard. What we say is clear error was that in the draft EIS, it's very clear that the legacy soil damage is extensive in this project area, such that some of the sub-watersheds where the regional standard is being applied on a cutting unit by cutting unit basis are cumulatively already over 15% disturbance, so... Well, what was the time interval between the first logging that did some unquantifiable damage and the new logging? How much time... Well, I think the record shows most of the logging took place during the 60s in this particular drainage. So you've got 30, 40 years of whatever... Soil, again, your honor, soils cannot be replaced once they've been irreversibly damaged. As it washes on downstream, it can't be replaced. It's the exact same soil, but you do get some healing effect when... Over a period of centuries, as the forest degenerates and trees fall to the ground and beetles and whatever break down the trees, soil is replaced over a period of centuries. But what Congress was recognizing is the same thing that farmers recognize, that once you've irreparably damaged the soil resource, you no longer have sustainable timber harvest. Basically, you no longer have a forest that's able to regenerate itself. They do have second-growth timber, though, in these areas that are under study right now. I'm sorry? There is second-growth timber in these areas that are being logged now. So the trees are growing back, I think. Well, your honor... That's why they're logging. That may be the case, your honor, but what basically Congress is saying is that logging has to be sustainable. I mean, that's what the National Forest Management Act is about. What happens with soil productivity, when you damage soil productivity, you end up with stunted growth. So, yes, the trees might be... In this particular case, this is a wildfire fuel reduction project, more than it is a logging. They're not selling the trees to make money. Forest Service isn't trying to make money selling the trees. They may actually make up a little change here and there, but it's supposed to be a fire hazard reduction project. Now, in that kind of a situation, there's a balancing that has to be done between the cost benefits of fire reduction and the cost benefits of leaving a pristine forest for future generations. Yes, your honor, that is correct. Now, where did the judge go wrong in this case in balancing those two sides? Well, the Healthy Forest Restoration Act recognizes that balancing, but it does not excuse the Forest Service from complying with the law. It still has to comply with the substantive mandate of the law. So if this area happens to be an area where cumulatively timber harvest has resulted in irreparable damage to the productivity of the land, then the law does not allow any more of this type of logging. But as a more practical matter, your honor, even the plaintiffs in this case were not opposed to all logging. They just wanted, and the majority of the public that commented, wanted the logging to be limited to the area of concern for the community. The community, wildland, urban interface. And the objection is that the Forest Service felt compelled to go a couple of miles away from there and enter into stands of trees, habitat that hasn't been disturbed before, and in an area of the forest that already does not comply with the minimum requirements for ensuring the viability of species that depend on that habitat. So there is some cutting that's not opposed, even though the soil in that segment exceeds the 15% criterion, but the balancing of fire hazard allows that to be overridden. Is that what you're saying, that the one that's proximate to the developed community and that's most at risk, immediate risk? Is that what you're saying? That's not exactly what I'm saying. What I'm saying is that the parties in this case were not opposed to some logging going forward in those areas, even though those areas may have exceeded the soil degradation standard. But when it goes too far out away from the populated area, the concern is they didn't surveil it, survey it, assess it properly, and the evidence indicates that those areas exceed the 15% criterion. My understanding, Your Honor, most of those areas are areas where they did not do the surveys. They didn't do any soil sampling. Well, I know, but they did overflights and they do aerial photographs and take anecdotal evidence. Yeah, and— I understand your arguing that that wasn't sufficient, but at least that's part of your argument that they failed to do a proper job on it. But your view, your position is, as a factual matter, that is it or that they just haven't established whether or not it exceeds this 15% limit. That's what I'm trying to understand. You say it's undisturbed forests where the soil degradation already exceeds the limit. Do you know that or you're saying they failed to establish that it does? It's undisturbed in the sense that it hasn't been previously logged in many of those areas. However, every affected drainage in this case has been subject to grazing, cattle grazing, for over 60 years. And what the Forest Service scientists proved was that even though you can say this area has been previously logged, you can't determine whether the soils have been already irreparably damaged because of grazing, for instance. And there is evidence that, for instance, the invasive weeds that they observed in many of these areas basically show that those areas have been disturbed by cattle grazing. When you refer to the scientists, I assume you mean Mr. McBride? Oh, not in relation to that issue of, I think it was Unit 30D. I don't know who did the soil sampling, but this was an area like these other areas where they said, well, this... Mr. McBride played a role in making the scientific evaluation, did he not? I think Mr. McBride was responsible for overseeing any of the sampling of soils. He was the bitter-rich soil scientist, yes. Well, wasn't in the end, in terms of the final EIS, weren't his recommendations inculcated into the final EIS? Only in reference to the proposed cutting units. The main issue he raised had to do with cumulative effects of logging on a landscape scale. The legacy soil damages, he called it, which he characterized as information that accurately portrayed the condition of the soils. That entire section, that entire issue and that section from the draft EIS was simply dropped. There was no analysis in the final EIS of this legacy soil damage and what effect that's going to have on the ability of this area to regenerate. This is, after all, a restoration project. This case has many parallels to Lands Council versus Powell. If you substitute soil productivity for water quality in that case, they're heavily relying on commercial logging to go in and restore an area that they say is unhealthy because of past commercial logging. I'm troubled by your comment about Lands Council. I thought the problem with Lands Council is it was just a flat-out ignoring of the issue. Here, changes were made, as Judge Goodwin suggested. Certain units were added and dropped and other changes made. In terms of our review at this level, don't we have to take a somewhat deferential view and not get into second-guessing the scientific issues? Again, Your Honor, yes. With regard to the application of the regional soil quality standards to the proposed cutting units, we are not arguing that you should look over their shoulder and second-guess that, with the exception noted by Judge Fischer of the 700 acres that they didn't do any sampling on at all. With regard to the cumulative effects, the aerial extent of disturbance from past logging and proposed logging and reasonably foreseeable logging, the ability of this forest to regenerate in spite of damaged soils in sub-watersheds that have already more than 15% disturbance, that's the issue of analysis that's critical to actually restoring this watershed. And that is the issue that is required to be analyzed in a NEPA document because it's a cumulative effects issue, just as in Lands Council, the cumulative effects issue was the effect on water quality. Here, the cumulative effects issue is the effect on soil quality. And just as in Lands Council, the court asked how is this logging going to actually help fish, or more specifically, the water that those fish live in, the question raised here is how is logging going to help these trees and this forest to regenerate, or more specifically, the soils that these trees grow in. And that was the main issue of concern raised in the draft EIS, and because analysis of that issue would lead to a result that would not support the decision to log, instead of responding to that issue or analyzing it, it was simply dropped. And that's where the Forest Service went wrong in this case. Has this issue been, you said this case has been proceeding long in the district court. Has there been further litigation, evidence, and testimony, and all that on the issue you've been talking about? No, Your Honor. Basically, that issue, we've raised that issue at both this court and in the lower court, and there's really not been a response to that issue at this point. The Forest Service just says, the only response has been the Forest Service says, well, we moved that analysis into the water quality section. In other words, we considered the fact that soils have been disturbed and impacted in terms of the increased water yields and the effect on the stream stability. But that's not the issue raised by the soil scientists. The issue is, what about the effect on the productivity of the soil and the ability of trees to grow when we replant them or when they regenerate themselves? That's the issue that Congress was concerned with, and that's the issue that we maintain, and we will prevail on as a matter of law under recent decisions from this court in Ecology Center v. Austin and Lands Council v. Powell. Thank you, Your Honor. Thank you, Counsel. We will hear now from the government as well as the intervenors, so we'll start first with... Marie Carabagno for the United States, Your Honor, from the Department of Justice. Your Honor, I will be taking 12 minutes, and I will cede eight minutes of my time to counsel for the intervenors, who's with me at the table, Julie Weiss. May it please the Court, I'm representing the United States Forest Service and Forest Supervisor Dave Bull, who's in the courtroom with me today. Your Honors, as the Court has addressed somewhat, this is a very small project called the Middle East Fork Project on the Bitterroot National Forest in Montana. There's a community of about 500 people that lives up a single road that goes into this project area, and the project is designed to treat what's basically a sick and unhealthy forest that's been ravaged by a bark beetle epidemic, and to address unhealthy forest conditions to prevent a catastrophic wildfire. Now, Wild West has essentially stood up here and made a de novo argument in this Court, but the standard of review here is, as the Supreme Court emphasized in Purcell v. Gonzales, handed down just last month, that it's necessary as a procedural matter for the Court of Appeals to give deference to the District Court. And Wild West has stated at the outset of the argument that they were going to identify errors of fact or law in the District Court's analysis, and I did not hear any errors of fact or law stated. Well, I thought he was trying to say that the law mandates consideration of the soil quality regeneration factor, and as a matter of fact that it's undisputed that that hasn't been addressed on a cumulative effect basis. Well, it's not undisputed that the cumulative impacts have not been addressed, and I would point out that that issue was not raised at the preliminary injunction phase. There's no discussion of cumulative impacts in the District Court's opinion because it wasn't raised by Wild West at the preliminary injunction phase, and the District Court obviously cannot abuse its discretion on an issue that was not before it. But let me briefly address this cumulative impacts question. The plaintiffs keep saying that this analysis was dropped from the draft EIS into the final EIS, and that simply is not true. The analysis was revised and expanded, and the excerpt of the record, the administrative record, supports this. About 3,400 acres of the area have had past management activities. Forest Service analyzed the direct, indirect, and cumulative impacts of those activities, as NEPA requires, in detail in the environmental impact statement, and that's in the supplemental excerpts of the record at pages 384 to 396, and the cumulative impacts are addressed at pages 402 to 415. The analysis that was supposedly dropped was carried over into the final EIS and, again, expanded supplemental excerpts of the record at 240 to 246, 402 to 411, and site-specific soil conditions surveys were also added. That's supplemental excerpts of the record at 378 and 379. One of the questions that the court asked Wild West was about the 15% standard or guideline. Where does that come from, that 15%? It comes from the Forest Service manual, Your Honor, which is not binding on the Forest Service, and here it was not treated as a binding standard. It was treated as a tool to guide the analysis, and I think the court asked Mr. Woodbury about units that they did not object to, the non-commercial cutting units and whether the 15% standard was exceeded there, and as a matter of fact, the record of decision shows that the 15% standard, wherever the Forest Service concluded that the 15% standard or guideline had been exceeded or would be exceeded, whether the units were commercial or non-commercial, those units, in response to the comments of Wild West and other environmental groups, those units were dropped from the decision. There are no units in this project that exceed the 15% guideline. Nor was the 15% guideline the only standard that the Forest Service relied on. As the court pointed out, the standard here is arbitrary and capricious, and under NEPA, we took that hard look by looking broadly at the cumulative impacts, not just on the sub-watershed level, but as a whole, we considered the cumulative impacts, and as was also asked of Wild West, what about Ken McBride, the soil scientist on the project? The district court correctly determined that the Forest Service relied on Ken McBride, who Wild West has argued took a hard look at the soils, and the Forest Service used that analysis in reaching its conclusions. I think the court asked whether there was a dispute between some of the Forest Service experts, and there was a difference of opinion about how to treat detrimental soil disturbance. A peer review group that reviewed Mr. McBride's analysis concluded that he had overestimated the soil detrimental disturbance because he had concluded that all disturbance is detrimental, and in fact, that is not the case. But importantly, the Forest Service used Mr. McBride's more conservative assumptions in the final analysis, and that is also borne out by the record. The Lands Council case is simply not applicable here. The Forest Service had more than just anecdotal evidence and aerial photographs for units that were not sampled directly, about 700 acres. The Forest Service put boots on the ground in every unit that is going to have harvest, and the people that went out there looked for evidence of past harvest activity. They looked for evidence of grazing, and they looked for evidence of noxious weeds, and all of that was factored into making the final decision. Earlier in your remarks, you mentioned the waiver not bringing the facial validity of the soil quality standard before the trial court. I think they claimed in one of their briefs that they did bring it up in their oral argument in the district court, even though it wasn't in their plea. Well, Your Honor, the transcript of the district court arguments are not before the court. There's no evidence that it was brought up. Well, were you there? I was there. Well, was it brought up? Your Honor, I don't believe that it was brought up. The plaintiffs argued that there was legacy soil damage.  If they did bring it up in their oral argument, would that satisfy the waiver problem? Well, Your Honor, I think that they have to do more than just bring it up. They have to support it with argument. There's case law on that point. You can't just mention the words cumulative impacts and presume that the court is going to be able to reach a decision about whether the analysis was arbitrary and capricious. And the district court made no such determination because there was no evidence before it on that point. Did Judge Moy ever go out and take a view of the premises? Not that I'm aware of, Your Honor. It might have brought about a settlement if it had. Let me just address one last issue unless the court has any more questions. Can I just understand? I see in the draft there is a whole section entitled worksheet for consideration. At least there's in ER 112 that I'm looking at. Worksheet for consideration of cumulative effects to the soil resource. Is it? And then in the document that's talking about changes between the draft EIS and the final EIS, it says additional cumulative effects analysis was provided, particularly for past timber harvest activities. Is that terminology coextensive with legacy and what the plaintiffs have been arguing here or is that a different way? Yes, Your Honor. That is exactly the analysis that was carried forward into the final EIS and expanded. Counsel was arguing that it was really only applied looking to regional as opposed to the overall forest cumulative standards as I understand the argument. And you're saying that that was addressed. I'm saying that both were done. The 15% guideline applies to the activity area which is appropriate because you want to know what the impacts are on the smaller level and then you get to what the impacts are on the bigger level. And here we did both. We considered the 15% guideline at the unit level and then we took an overall hard look at things at the watershed and sub-watershed level to consider the cumulative impacts. And that information from the worksheet which was developed by Mr. McBride was carried over into the final EIS where we talked about what long-term damage to soils and recognized that the longer-term effects of these prior activities have to be taken into account. But the FEIS examined the issue and there was no indication that this harvest that had taken place mostly in the 60s, as the Court pointed out, has had any direct or has had any negative impact on the soils. So there were actual people who went out to the areas, the contested areas, where the cutting is, but they didn't do any actual soil sampling of that, right? They just did a visual observation. For 700 acres of the 5,000 acre project, there was a visual observation, but in areas where there had been prior harvest activity, there was soil sampling done. Right. You're down to about eight minutes, counsel. Just one last point, Your Honor. Under the Healthy Forest Restoration Act, Congress has changed the calculus for considering the balancing of the equities and has directed the courts to take into account the risks to the community that will occur if this project does not go forward. We ask this court to affirm the district court's denial of the preliminary injunction. Thank you. Thank you, counsel. May it please the Court, my name is Julie Wise, and I represent the intervener appellees in this case. The interveners are a coalition of public and private entities and individuals who live and work in and around the project area. Because they reside in the Middle East Fork Project area, implementation of this project is particularly important to these people and entities for the protection of people, property, and natural resources. With the court's leave, interveners would make one main point today, and that is that under this court's deferential review of preliminary injunction decisions, the district court's decision should be affirmed. First, however, I would like to follow up on Judge Goodwin's question regarding the record in this case, because it is an appellant's burden to make sure that the record on appeal is complete. And in this case, the facial challenge to the 15% soil standard, to the best of my recollection, also having been at the district court argument, a facial challenge to that was not made. But more importantly, counsel for Wild West never bothered to file a reply brief, never asked for leave to file a reply brief, never moved the district court for admission of his notes at oral argument, which then later found themselves into the appendix and a reply brief in this court. And most fundamentally, appellant did not take any initiative to have a transcript of oral argument prepared or designated as part of the record on appeal. Therefore, this court is unable to review those allegations, because there is simply nothing before it on which to decide that the district court could have abused its discretion. On the main point, Your Honors, this court has stated repeatedly that a district court's decision with regard to preliminary injunctive relief is given very limited and deferential review. Judge O'Scanlan stated at the outset, isn't the standard of review abuse of discretion? And it absolutely is abuse of discretion. This court does not substitute it. I think we know what the standards are, I think, at least. Do you have any disagreement or different take on this dispute with respect to the soil quality, though, in terms of the extent to which the focus, and I don't want to mischaracterize or misstate the point of this argument, but at least as I'm trying to sort it out for my own analysis, the extent to which there was adequate consideration going beyond the most adjacent units to your clients, going farther and deeper into the forest, this notion that there was a short-term, short geographical term look, but not enough scientific analysis of the effects in the to-be-logged area. Do you have any take on that that's different from the government? Your Honor, we don't disagree with the government's take on it, but I would like to inform you a little bit of some of the facts that inform the court's decision. This project is almost entirely in the wildland-urban interface. More than 90% of the project is in the wildland-urban interface, and that is the area where there are private structures and there are people at risk. Only about 9% of this project is outside of the wildland. Well, I know, but the impression I'm getting is that, to some extent, the plaintiffs are agreeing that that aspect is going beyond, as you said, that 9% or whatever the percentage is. Well, Your Honor, that 9% of the project area is an area that has been heavily impacted by the beetles, the Douglas-fir bark beetle. And that was another reason that this project was important, to actually try to restore these habitats that had been detrimentally impacted by the bark beetles. And the cumulative soil analysis, the legacy soil analysis, is basically the same thing. It was in the draft EIS in one section, and in the final EIX, it was put into a different section. The EIS explained the changes. We have fully briefed this issue. And, Your Honor, no, there is absolutely no merit to this assertion that that 9% that is outside the wildland-urban interface somehow cannot go forward and is fundamentally different from the 91% that is in the wildland-urban interface. But this is an HFRA case, and that's very important to keep in mind because HFRA is a statute that was enacted to help communities like the Middle East Fork community. It was enacted to help communities that have taken the initiative to prepare a community wildfire protection plan. After the fires of 2000, they were detrimental fires of 2000 in Montana. After those fires, the community went together and formed a community wildfire protection plan. And Congress has stated in the HFRA that this is exactly the sort of area in which priority should be given to hazardous fuel reduction. And because we've heard a lot about the merits in this case, I would like to briefly touch on the harms because contrary to what Counsel for Wild West stated, the district court also found that Counsel for Wild West had failed to demonstrate a significant or a possibility of irreparable harm. The district court stated, Your Honors, that Counsel for Wild West had failed to demonstrate any citations to the science, citations to the record, factual citations that supported allegations of irreparable harm that would support a preliminary injunction in this case. In contrast, the record is replete with references to declarations from individuals who live in the East Fork community and want to see this project proceed for their own safety and for the safety of their neighbors. The declaration of Robert Whetstone, the Sula Volunteer Fire Chief. He has stated that it is his job to protect people's safety in this area and to protect the safety of his 27 fellow volunteer firefighters. The Middle East Fork project area, when we say it's a one-way in, one-way out road, we mean that just east of the project area, the road literally dead ends. And so if folks are going to have to evacuate this area during a fire, they're going to have to travel through Middle East Fork project area. And those were the sorts of harms that were before the district court. The first contract has been awarded now. The Spring-Mink stewardship contract has been awarded. It is being implemented now in the three highest priority units. One of those units is actually in the record. And we have a photograph in the intervener supplemental excerpt of the record, and that is at page 150. And this is a photograph of Unit 37. And Unit 37 shows structures. There is actually a private residence, and there are outbuildings in close proximity to this forest that is not a healthy forest in any fashion. This is the sort of area in which this project is being implemented. This is not some pristine, healthy forest. This is a forest that has moved away from its historic conditions because of fire suppression. So this is the sort of information that was before the district court. And I urge you, if you haven't read those declarations, read those declarations. The declaration of Becky Linderman, who was separated from her child during the fires of 2000, during the evacuation, she was so traumatized by that that she has now made it her mission to educate people about wildfire and to assure that projects like this can go forward. She now works for the Bitterroot RC&D, which helps to educate people in the local community. The declaration of Byron Bonney discusses the community wildfire protection plan and how the community came together after the fires of 2000 and decided that they did not want to lose their East Fork community to fire. These are the sorts of evidence of harm that was before the district court and fully supported the district court's decision not to enjoin the Middle East Fork project. And unless the court has any questions, I'll simply ask the court to affirm the district court's conclusion and allow this project to continue. Thank you. Thank you, counsel. The case just argued will be submitted for decision. I didn't hear a request for a reservation of rebuttal, and I think you used just about all your time. I'm sorry? Oh, well, if that's true, you may certainly use them. I didn't hear a request for a reservation of rebuttal. I'm sorry. Go ahead. I just want to make one last point, and that is on the issue of cumulative effects and legacy soil damage. If your honors would just look at the section on legacy soil damage in the excerpts of record at 106 to 110, it would be very easy to appreciate the concern that's being raised there. And then if you will try to actually find where that concern is addressed in the final EIS, you will not be able to find it, and that is our main point. And, again, we're not opposed to this project from going forward. We're opposed to the logging of what we consider to be valuable old-growth species habitat away from the area of concern. And we've been very careful at every step to limit our request for injunctive relief. We're not asking the court to completely enjoin the project from going forward, at least for purposes of preserving the interests that are primary and forefront in our clients' minds, that is the interest in preserving old-growth species habitat. If the court was simply to issue an injunction against logging areas that were previously designated old-growth habitat by the Forest Service, that would be sufficient to preserve the status quo to the extent necessary to resolve the merits of this case and avoid irreparable injury. Thank you, counsel. Thank you, Your Honor. Your time has expired. The case just argued will be submitted for decision, and we will hear argument in Center for Biological Diversity v. Lone.
judges: Goodwin, O'scannlain, Fisher